# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

RANDY BRUCE LAMICA,

|                                        |                    |                 |
|----------------------------------------|--------------------|-----------------|
|                                        | Plaintiff,         |                 |
| -v.-                                   |                    | 5:14-CV-1284    |
|                                        |                    | (GLS/ATB)       |
| COMMISSIONER OF SOCIAL SECURITY,       |                    |                 |
|                                        | Defendant.         |                 |

JAYA SHURTLIFF, ESQ., Attorney for Plaintiff
SANDRA M. GROSSFELD, Special Asst. U.S. Attorney for Defendant

ANDREW T. BAXTER, United States Magistrate Judge

## REPORT and RECOMMENDATION

This matter has been referred to me for Report and Recommendation by the

Honorable Gary L. Sharpe, United States District Court Judge pursuant to 28 U.S.C.

§ 636(b) and Local Rule 72.3(d). This case has proceeded in accordance with General

Order 18.

## I. PROCEDURAL HISTORY

On June 21, 2011,[1] plaintiff protectively filed an application for Disability

Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"), alleging

disability beginning May 6, 2011. (Administrative Transcript ("T") at 157-73). The

---

[1] The court notes that the protective filing date is not on either application for benefits. Plaintiff has stated that his protective filing date is June 21, 2011, and defense counsel has adopted the plaintiff's facts. The protective filing date is listed as the "filing date" and appears at the top of the Disability Determination and Transmittal Forms. (T. 44-85). While plaintiff alleges that the protective filing date is June 21, 2011, the Disability Determination and Transmittal Forms indicate that the "filing date" is June 22, 2011. (T. 44, 53, 62, 74). Defendant does not take issue with this, and the difference in the dates is not relevant to the court's decision.

applications were denied initially and again on reconsideration.[2] (T. 44-61, 62-85).

Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), which was

held on October 15, 2012. (T. 23-43). On January 14, 2013, ALJ Elizabeth W.

Koennecke found plaintiff was not disabled. (T. 5-22). The ALJ's decision became the

Commissioner's final decision when the Appeals Council denied plaintiff's request for

review on August 18, 2014. (T. 1–3).

## II.  GENERALLY APPLICABLE LAW

### A.  Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI

disability benefits must establish that he is "unable to engage in any substantial gainful

activity by reason of any medically determinable physical or mental impairment which

can be expected to result in death or which has lasted or can be expected to last for a

continuous period of not less than twelve months . . . ." 42 U.S.C. § 1382c(a)(3)(A). In

addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity
> that he is not only unable to do his previous work but cannot, considering
> his age, education, and work experience, engage in any other kind of
> substantial gainful work which exists in the national economy, regardless
> of whether such work exists in the immediate area in which he lives, or
> whether a specific job vacancy exists for him, or whether he would be
> hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

---

[2] There are documents in the record, indicating that the Commissioner also denied benefits after "informal remand" on April 26, 2012. (T. 86-91). Neither party mentions this determination, and it is also not relevant to this court's decision.

The Commissioner uses a five-step process, set forth in 20 C.F.R. sections

404.1520 and 416.920, to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520,

416.920. The plaintiff has the burden of establishing disability at the first four steps.

However, if the plaintiff establishes that her impairment prevents her from performing

her past work, the burden then shifts to the Commissioner to prove the final step. *Id.*

## B. Scope of Review

In reviewing a final decision of the Commissioner, a court must determine

whether the correct legal standards were applied and whether substantial evidence

supported the decision. *Selian v. Astrue*, 708 F.3d at 417; *Brault v. Soc. Sec. Admin,*

*Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g)). Substantial evidence

is "such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Talavera v. Astrue*, 697 F3d 145, 151 (2d Cir. 2012). It must be "more

than a scintilla" of evidence scattered throughout the administrative record. *Id.* However, this standard is a very deferential standard of review " – even more so than the 'clearly erroneous standard.'" *Brault*, 683 F.3d at 448.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision. *Id. See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to explicitly analyze every piece of conflicting evidence in the record. *See, e.g., Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony). However, the ALJ cannot "'pick and choose' evidence in the record that supports his conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112, at *6 (W.D.N.Y. Dec. 6, 2010).

## III.  **FACTS**

Plaintiff's brief includes a detailed summary of the medical records and the hearing testimony. (Pl.'s Br. at 3-7) (Dkt. No. 16). Defense counsel has incorporated the plaintiff's statement of facts, except for any "inferences or conclusions therein."

(Def.'s Br. at 1) (Dkt. No. 23).  Defense counsel has also incorporated the ALJ's statement of the case.  Based on the parties' agreement, the court will also incorporate the plaintiff's statement of the facts into this decision.  Rather than reciting all the medical and testimonial evidence at the outset, the court will discuss the relevant details below, as necessary to address the issues raised by plaintiff, and with any exceptions as noted.

## IV.  ALJ'S DECISION

Plaintiff alleged disability beginning May 6, 2011, based upon a right leg, below-knee amputation, phantom limb syndrome, peripheral vascular disease, depression, lower back pain, left hip pain, and right leg pain. (T. 11).  At Step Two of the disability analysis, the ALJ found that only the "residuals of [plaintiff's] right leg amputation" rise to the level of a "severe" impairment. (*Id.*)  The plaintiff's other impairments were found to be non-severe or not "medically determinable." (T. 11-12).

At Step Three of the disability analysis, the ALJ found that plaintiff's right leg amputation did not meet or equal the severity of a Listed Impairment. (T. 12).  The ALJ compared the "residuals" of plaintiff's amputation with the requirements of Listing 1.05 which involves "amputation due to any cause." (T. 12) *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.05.  The ALJ found that plaintiff did not meet the criteria contained in Paragraph B of Listing 1.05, which in addition to an amputation above the tarsal region, requires "stump complications resulting in medical inability to use a prosthetic device to ambulate effectively, as defined in listing 1.00(B)(2)(b)." (T. 12).  Among the bases for the ALJ's determination was her finding that an October 30, 2012 examination of

plaintiff's stump showed "a well-healed scar, no open wounds, no skin breaks, and no blisters. (T. 12) (citing Ex. 14F – T. 429-31). The ALJ also discussed plaintiff's ability to ambulate and noted that plaintiff was able to use his prosthetic device. (*Id.*) Thus the ALJ found that plaintiff did not have the stump complications, sufficient to meet a central requirement of the Listing. (*Id.*)

The ALJ found that plaintiff had the residual functional capacity ("RFC") to occasionally lift/carry 20 pounds; frequently lift/carry 10 pounds; sit for six hours; and stand/walk for six hours; but concluded that plaintiff should avoid exposure to wetness. (T. 12). In making this determination, the ALJ reviewed the medical and non-medical evidence in the record. The ALJ gave "some weight" to the opinion of Joseph Lizotte, plaintiff's prostheticist. (T. 13). Although Mr. Lizotte completed a very restrictive RFC evaluation, the ALJ adopted only the portion of the report which stated that plaintiff should avoid "extreme" wetness. (*Id.*) Although Mr. Lizotte was not an "acceptable medical source" for purposes of opining on plaintiff's physical limitations,[3] he was qualified to comment on the fact that the prosthesis was not waterproof, and therefore, plaintiff must avoid extreme wetness. (*Id.*)

The ALJ gave "significant weight" to State Agency Medical Consultant, Benjamin Corijo, M.D., who "affirmed" the RFC completed by a State Agency Single Decision Maker ("SDM"), finding that plaintiff could perform the physical requirements of light work. Although the SDM is not a physician and thus, not an

---

[3] The ALJ also found that Mr. Lizotte's estimation of plaintiff's physical abilities was inconsistent with "all of the opinion evidence of record from acceptable medical sources." (T. 13).

acceptable medical source on his or her own, the ALJ stated that Dr. Corijo's assessment of plaintiff's physical limitations "also supports the plaintiff's ability to perform light work." (T. 13). The ALJ found that Dr. Cortijo's opinion was consistent with the "other medical opinion evidence of record." (T. 14).

The ALJ gave "substantial weight" to the consultative opinion of Dr. Kalyani Ganesh, dated October 30, 2012. (T. 14) (citing T. 429-31). Dr. Ganesh found that plaintiff could occasionally lift up to 100 pounds and frequently lift up to 50 pounds; sit for eight hours; and stand and walk for six hours each, for three hours without interruption. (T. 14). Dr. Ganesh stated that the use of a cane was "medically necessary" for "distances," and that plaintiff could ambulate without a walker or a wheelchair. He could also ambulate without using two canes or crutches. (*Id.*) The ALJ stated that Dr. Ganesh's opinion was not "***inconsistent***" with the ability to perform light work and was supported by the other evidence of record. (*Id.*) (emphasis added).

The ALJ gave "little weight" to a written statement, authored by Carmen Moody, a State Department of Health and Human Services case manager on July 6, 2011 because she was not an acceptable medical source and because her statement was based solely upon plaintiff's subjective report of his condition. (T. 14). Finally, the ALJ gave "minimal" weight to the statement offered by plaintiff's wife. (*Id.*) The ALJ found the statement to be duplicative of the hearing testimony and found plaintiff's wife to be a "financially interested and sympathetic party."[4] (*Id.*)

---

[4] Plaintiff does not argue that the weight given to his wife's statement was incorrect. The court notes that plaintiff's wife's statement implies that plaintiff must use crutches, a walker, or a wheelchair. (T. 231). No medical source has ever made such an observation, after plaintiff's initial

The ALJ also found that plaintiff's allegations of disability were not supported by the evidence and listed examples which "detract[ed] from the [plaintiff's] credibility. (*Id.*) These examples included the fact that plaintiff quit his job because of a downturn in the economy, and the "issue with his leg" did not arise until after he left his job; he was only taking a low dose of aspirin and Flexeril[5] because the "side effects made him drowsy," and he was not taking any "pain" medication. (T. 14). Plaintiff was able to drive using his left leg, although he tried not to do so. He drove himself to the store for milk and bread approximately once per week. Dr. Ganesh's examination of the plaintiff's stump showed that the scar was well-healed, with no open wounds, skin breaks, or blisters. (*Id.*)

At Step Four, the ALJ also found that plaintiff was unable to perform his past relevant work as a short-order cook in his family's restaurant because it involved more than a light level of exertion. (T. 15). The ALJ then proceeded to Step Five. She noted the plaintiff's age, education, and prior work experience. (*Id.*) The ALJ determined that plaintiff retained the ability to meet all the exertional requirements of light work. (T. 15-16). The ALJ then found that the non-exertional limitation of avoiding extreme wetness would have very little or no effect on the occupational base of light work. Thus, the ALJ used the Medical Vocational Guidelines to determine that plaintiff was not disabled. (T. 15-16) (citing 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 202.14).

---

discharge from the hospital, during which he was using crutches. (T. 315).

[5] Flexeril (Cyclobenzaprine) is listed first as a "muscle relaxant," but is also used for pain. www.drugs.com/flexeril.html.

## V.     ISSUES IN CONTENTION

Plaintiff raises the following arguments:

1.      The ALJ erred in determining that plaintiff does not meet the requirements of a Listed Impairment. (Pl.'s Br. at 8-11).

2.      The ALJ erred in determining that plaintiff was capable of a full range of light work. (Pl.'s Br. at 11-14).

3.      The ALJ erred in his credibility determination. (Pl.'s Br. at 14-16).

4.      The ALJ erred in failing to call a vocational expert ("VE"). (Pl.'s Br. at 16-18).

Defendant argues that the Commissioner's determination was supported by substantial evidence and should be affirmed.  For the following reasons, this court agrees with defendant and will recommend dismissal of the complaint.

## VI.    LISTED IMPAIRMENT

### A.     Legal Standards

At Step Three of the disability analysis, the ALJ must determine if plaintiff suffers from a listed impairment. *See* 20 C.F.R. §§ 404.1520, 416.920.  It is the plaintiff's burden to establish that his or her medical condition or conditions meet *all* of the specific medical criteria of particular listed impairments.  *Pratt v. Astrue,* No. 7:06-CV-551, 2008 WL 2594430 at *6 (N.D.N.Y. 2008) (citing *Sullivan v. Zebley,* 493 U.S. 521, 530 (1990)).  If a plaintiff's "impairment 'manifests only some of those criteria, no matter how severely,' such impairment does not qualify." *Id.*  In order to demonstrate medical equivalence, a plaintiff "must present medical findings equal in severity to all the criteria for the *one* most similar listed impairment." *Sullivan v. Zebley*, 493 U.S. at

531 (emphasis added).

## B. Application

Plaintiff argues that he meets the requirements of Listing 1.05. The relevant portion of Listing 1.05 is section 1.05(B) which requires that one or both of plaintiff's lower extremities be amputated at or above the tarsal region,[6] with "stump complications *resulting in medical inability to use a prosthetic device to ambulate effectively*, as defined in 1.00B2b." 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 1.05(B) (emphasis added). The Listing refers the reader to the definitional section and subsections of Listing 1.00 (Musculoskeletal System). The inability to ambulate effectively is defined as "an extreme limitation" of the ability to walk:

> *i.e.*, an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities . . . .

*Id.* The definition further states that to ambulate "effectively," the individual must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. *Id.* § 1.00(B)(2)(b)(2). The individual must be able to travel, without companion assistance, to and from a place of employment or school. *Id.* Examples of the inability to ambulate effectively include, "but are not limited to," the inability to walk without the use of "a walker, *two*

---

[6] The tarsal region encompasses the ankle. www.medical-dictionary.thefreedictionary.com/tarsal.

crutches or *two* canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

*Id.* (emphasis added).

In his brief, plaintiff focuses on this "definitional" section and argues that the record shows that he cannot ambulate effectively. Plaintiff states that Dr. Ganesh found that plaintiff could not walk a block at a reasonable pace on rough or uneven surfaces, and he could only walk 200 feet at a time with the use of a cane. (Pl.'s Br. at 9) (citing T. 433, 437). Plaintiff argues that the ALJ did not mention this portion of Dr. Ganesh's report when the ALJ discussed whether plaintiff met a listed impairment, creating a "factual and legal error," particularly because later in the ALJ's decision, she gave Dr. Ganesh "significant" weight. (*Id.*)

While plaintiff focuses on the definitional sections of the musculoskeletal listings in general, he has not cited to any part of the record which supports a finding that he meets the actual requirement of Listing 1.05(B), which involves, in addition to the amputation, ***stump complications***, resulting in the "***medical inability to use a prosthetic device*** to ambulate effectively." 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 1.05(B). Plaintiff told Dr. Ganesh that his stump "gets sore," and that he got blisters

"every now and then," but Dr. Ganesh's narrative report,[7] dated October 30, 2012, states that an "[e]xamination of the stump shows a well-healed scar. No open wounds. No skin breaks. No blisters at this time." (T. 431). Because plaintiff did not have stump complications, preventing him from using his prosthesis,[8] his impairment does not rise to the level of Listing 1.05(B).

In addition, in this portion of his brief, plaintiff has incorrectly cited Dr. Ganesh's RFC evaluation.[9] The question on the RFC form states "How far can the individual ambulate **without** the use of a cane." (T. 433). Dr. Ganesh's answer is "200 feet." (*Id.*) He states that the cane is "medically necessary" for "distances," and that with the cane, the plaintiff may use his free hand to carry small objects. (*Id.*) Dr. Ganesh does not say that plaintiff can only walk 200 feet **with** his cane. Thus, it is clear from Dr. Ganesh's report and his RFC evaluation that plaintiff can ambulate effectively with the use of his prosthesis and his cane. Dr. Ganesh specifically stated that plaintiff needs the cane "for distances," implying that plaintiff can walk greater distances with his cane.[10]

---

[7] Dr. Ganesh's RFC evaluation is dated November 15, 2012. (T. 437).

[8] On January 11, 2012, Dr. Sheryl S. Joyner, M.D. found that plaintiff's "prosthesis [was] functioning well with adjustments." (T. 406). There is absolutely no evidence indicating that plaintiff had any complications with the stump which prevented him from using his prosthetic device. This will be discussed further below in the court's analysis of the ALJ's RFC determination.

[9] This may be a typographical error, although an important one, because plaintiff cites this portion of Dr. Ganesh's report correctly in a subsequent argument. (*See* Pl.'s Br. at 12).

[10] Dr. Ganesh's narrative report states that plaintiff "presents with a cane, which he states he uses for distances." (T. 429). After the examination, Dr. Ganesh stated that the plaintiff has a "prosthetic gait," and "[h]e needs a cane for distances. He would have a moderate limitation at this time for standing, walking, and climbing." (T. 431).

Dr. Ganesh also stated that plaintiff could "never" climb ladders or scaffolds or balance, but he could climb stairs "frequently" and could "occasionally" stoop. (T. 435). Dr. Ganesh also found that plaintiff could "continuously" operate a motor vehicle. (T. 436). Although Dr. Ganesh's RFC did state that plaintiff could not walk a block at a reasonable pace on rough or uneven surfaces,[11] he could shop, travel without companion assistance, ambulate without a wheelchair or two canes or crutches, use standard public transportation, and climb a few steps at a reasonable pace using a single handrail.[12] (T. 437). As stated above, plaintiff must meet all the requirements for a listed impairment. Thus, plaintiff cannot rely on Dr. Ganesh's report as support for meeting the criteria of Listing 1.05(B), and the ALJ's determination that plaintiff does not meet a listed impairment is supported by substantial evidence.

## VII.  RFC

### A.  Legal Standards

RFC is "what [the] individual can still do despite his or her limitations. Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. . . ."  A "regular and continuing basis" means eight hours a day, for five days a week, or an equivalent work schedule. *Balles v. Astrue*, No. 3:11-CV-1386 (MAD), 2013 WL

---

[11] The court notes that plaintiff told Dr. Ganesh that "[t]he cane helps him walk on uneven ground." (T. 429). Thus, plaintiff admits to being able to walk on uneven ground with his cane for assistance.

[12] The court also notes that Dr. Ganesh found that plaintiff could "continuously" lift up to 100 pounds and "frequently" carry up to 50 pounds. (T. 432). Dr. Ganesh indicated that the "limitations" on carrying were due to the prosthetic leg. (*Id.*)

252970, at *2 (N.D.N.Y. Jan. 23, 2013) (citing *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96–8p, 1996 WL 374184, at *2)).

In rendering an RFC determination, the ALJ must consider objective medical facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations. 20 C.F.R §§ 404.1545, 416.945. *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999) (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)). An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities. *Martone v. Apfel*, 70 F. Supp. 2d at 150 (citing *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984); *LaPorta v. Bowen*, 737 F. Supp. at 183; *Sullivan v. Secretary of HHS*, 666 F. Supp. 456, 460 (W.D.N.Y. 1987)). The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence. *Trail v. Astrue*, No. 5:09-CV-1120, 2010 WL 3825629 at *6 (N.D.N.Y. Aug. 17, 2010) (citing Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *7).

## B. Application

The ALJ found that plaintiff could perform the full range of light work. Plaintiff argues that the ALJ disregarded medical evidence of plaintiff's difficulty standing and walking and failed to apply the "required legal standards in evaluating opinion evidence." (Pl.'s Br. at 11). The regulations state that light work requires "a good deal of walking or standing," and the ALJ found that plaintiff could "stand/walk" for six

hours. (T. 12). Plaintiff argues that while giving substantial weight to Dr. Ganesh's opinion, the ALJ failed to "acknowledge" Dr. Ganesh's finding that plaintiff could not walk a block at a reasonable pace on rough or uneven surfaces. (Pl.'s Br. at 12).

As stated above, Dr. Ganesh found that plaintiff could walk 200 feet without the use of his cane, but that plaintiff used his cane for "distances."[13] Plaintiff states that "given these limitations, it is difficult to assess in what manner Plaintiff could carry 21-50 pounds on an occasional basis . . . as found by the ALJ." (Pl.'s Br. at 12). Plaintiff also states that the ALJ did not indicate the duration that Plaintiff could stand/walk at one time." (*Id.*)

First, the ALJ found only that plaintiff could lift up to 20 pounds occasionally and 10 pounds frequently. (T. 12). The ALJ relied on Dr. Ganesh's estimation of plaintiff's ability to stand and walk, giving his report substantial weight. Thus, it is logical that the ALJ also adopted Dr. Ganesh's finding that plaintiff could stand and walk for three hours "[a]t [o]ne [t]ime without interruption." (T. 433). The ALJ did not mention Dr. Ganesh's statement about plaintiff walking 200 feet without his cane, but this was not an issue because the ALJ did not question plaintiff's use of the cane. Although an "ALJ cannot arbitrarily substitute his own judgment for a competent

---

[13] Dr. Ganesh examined plaintiff on October 30, 2012, after the hearing, at the request of the ALJ. (T. 42). The ALJ specifically stated that she was sending plaintiff for a consultative examination because he had not seen any physicians recently for his leg, and in fact had not seen a physician for his leg since plaintiff and his wife moved back to New York from North Carolina in February of 2012. (*Id.*)

medical opinion,"[14] there is no requirement that the ALJ pick one RFC and use that particular evaluation in its entirety. *See Matta v. Astrue*, 508 F. App'x. 53, 56 (2d Cir. 2013) (although ALJ's conclusion did not perfectly correspond with any of the opinions of medical sources, ALJ was entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole). There is no requirement that the ALJ accept every limitation in the opinion of a consultative examiner. *See Pellam v. Astrue*, 508 F. App'x 87, 89 (2d Cir. 2013) (ALJ properly declined to credit certain conclusions in CE's opinion that were inconsistent with other evidence of record); *Cruz v. Colvin*, 2014 WL 4826684, *14 (N.D.N.Y. Sept. 29, 2014) (ALJ may credit some portion of a consultative opinion, while properly declining to credit those conclusions that are not supported by CE's own examination findings and inconsistent with other evidence of record). Thus, plaintiff's argument that the ALJ improperly chose only portions of Dr. Ganesh's report cannot succeed.

Plaintiff argues that the ALJ erred in rejecting the RFC determination by Prostheticist Lizotte that plaintiff was incapable of working even at a sedentary level. (Pl.'s Br. at 12). The ALJ found that, other than Mr. Lizotte's statement that plaintiff should avoid wetness because the prosthesis was not waterproof, his other estimates of plaintiff's abilities were "an overestimation of plaintiff's limitations," and that his restrictive opinion was inconsistent with all of the opinion evidence of record from acceptable medical sources. (T. 13).

---

[14] *Rosa v. Callahan,* 168 F.3d at 79 (citing *McBrayer v. Sec'y of Health and Human Servs.*, 712 F.2d 795, 799 (2d Cir.1983)).

It is true that Mr. Lizotte is not an "acceptable medical source" for purposes of the regulations. 20 C.F.R. §§ 404.1513(d)(1); 416.913(d)(1). He is not a physician, he is a prosthticist, but it is unclear what his background is. Mr. Lizotte fitted plaintiff for the prosthesis and followed up with "adjustment" appointments. (T. 364-72). On September 23, 2011, Mr. Lizotte stated that plaintiff was "feeling off balance on uneven ground." (T. 365). He adjusted the prosthesis "to lengthen the toe level." (*Id.*) Mr. Lizotte stated that the "outcome" of these modifications was that plaintiff "notes feeling more balanced." (*Id.*)

The ALJ gave "significant weight" to Dr. Benjamin Cortijo, M.D., a non-examining State Agency Medical Consultant, who reviewed plaintiff's file on April 26, 2012. In his report, Dr. Cortijo "affirm[ed]" an RFC for light work, issued by a non-medical SDM.[15] (T. 393). In doing so, however, Dr. Cortijo noted that the "difficulty with this case is that all the medical notes are from recent surgery and healing of surgical site and progression of residual limb shaping as expected and therefore projection of good outcome." (T. 393). Dr. Cortijo discussed Mr. Lizotte's restrictive RFC, and stated that "[t]he opinions on function are provided by prosthesis [sic][16] and are really generic cautions for anyone in early gait training with prosthesis." (*Id.*) The notes indicating "difficulties with balance, gait, etc are the usual trial and error, with

---

[15] According to Dr. Cortijo, the SDM found that plaintiff could perform light work on October 19, 2011. (T. 393). There is no citation to the actual RFC evaluation by the SDM, however, in the reconsideration documents, there are reports, dated October 19, 2011, in which plaintiff is said to be able to perform light work. (*See e.g.* T. 70, 82, 84).

[16] Dr. Cortijo may have meant to write "provided by prostheticist."

modifications and the results of those modifications, which comes with any early prosthesis." Dr. Cortijo recommended that the agency obtain office notes from MD [sic] taking care of the prosthesis because these notes would presumably provide a description of plaintiff current ability to ambulate. The doctor concluded that if plaintiff were still having trouble ambulating with an "almost finished product," then a decreased ability to stand and walk could be "justified." (T. 393).

A review of Mr. Lizotte's notes indicates that Dr. Cortijo is correct. These notes recite plaintiff's complaints about the prosthesis and the adjustments made by Mr. Lizotte to alleviate any problems or concerns with using the device. Understandably, as a patient begins to use the device more and more, there are adjustments that need to be made to keep the device operating properly and to address any pressure points that may develop. The ALJ was entitled to give substantial weight to Dr. Cortijo's opinion and his affirmance of the SDM's RFC evaluation based upon the doctor's review of the record and based upon his analysis of the more restrictive RFC evaluation submitted by Mr. Lizotte. Mr. Lizotte wrote his RFC evaluation on February 9, 2012. (T. 392). In his contemporaneous office notes, Mr. Lizotte stated that plaintiff was "moving to NY."[17] The notes also indicated that Mr. Lizotte adjusted the prosthesis to alleviate distal tibial pressure, and that the result was "satisfactory." (T. 426).

As noted above, at the hearing on October 15, 2012, the ALJ told plaintiff that she was going to send him for a consultative examination because plaintiff did not "have any records basically from this year since you left North Carolina." (T. 42). The

---

[17] Plaintiff's surgery and subsequent care occurred in North Carolina.

ALJ was responsible for plaintiff obtaining a more current evaluation. Plaintiff was examined by Dr. Ganesh as a result. The ALJ then considered all the reports in the record, and the weight that she gave to those reports is supported by substantial evidence.

## VIII. <u>CREDIBILITY</u>

### A. **Legal Standards**

"An [ALJ] may properly reject [subjective complaints] after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.'" *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999) (quoting *Gallardo v. Apfel*, No. 96 CIV 9435, 1999 WL 185253, at *5 (S.D.N.Y. March 25, 1999)). To satisfy the substantial evidence rule, the ALJ's credibility assessment must be based on a two-step analysis of pertinent evidence in the record. *See* 20 C.F.R. § 416.929; *see also Foster v. Callahan*, No. 96-CV-1858, 1998 WL 106231, at *5 (N.D.N.Y. Mar. 3, 1998).

First, the ALJ must determine, based upon the claimant's objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged . . . ." 20 C.F.R. § 416.929(a). Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which it limits the claimant's capacity to function. 20 C.F.R. § 416.929(c). When the objective evidence alone does not substantiate the

intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the credibility of the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. 20 C.F.R. § 416.929(c)(3).

### B. Application

Plaintiff argues that the ALJ failed to properly assess plaintiff's credibility. The ALJ cited three "examples," which "detract from the [plaintiff's] credibility." (T. 14). The ALJ stated that plaintiff testified that his job ended due to the economy, and that the "issue" with his leg did not arise until after he had left his job. (T. 14). Plaintiff seems to interpret the ALJ's statement as an accusation that plaintiff "quit his job and immediately appl[ied] for disability." (Pl.'s Br. at 15-16). While it is unclear what the ALJ was attempting to state, it does not appear that she was making the accusation that plaintiff suggests because the ALJ states that plaintiff "testified that he left his job due to the economy." (T. 14). While it is not entirely clear that this statement relates to plaintiff's credibility, the ALJ had two other reasons for finding that, to the extent that plaintiff was claiming disabling pain, he was not credible.

The ALJ noted that plaintiff was only taking a low dose of aspirin and Flexeril.

The type, dosage, and side effects of medication taken to relieve symptoms are included in the factors listed above as a proper consideration for the ALJ to determine credibility. Plaintiff argues that the ALJ may not consider plaintiff's lack of medication because he cannot afford it. (Pl.'s Br. at 16). However, plaintiff testified that he did not get "medical treatment" after he moved to New York State because he could not get insurance or VA benefits. (T. 30).

When the ALJ asked plaintiff whether he was still getting medication, he said "yes." (T. 30). Then plaintiff stated that the only medication that he was taking was the aspirin and the Flexeril which he took for spasms and pain. (*Id.*) The ALJ asked how plaintiff was obtaining the Flexeril, and he stated that his primary care physician in North Carolina prescribed "five, six months worth" of pills, and he was using it "when I need to take it." (*Id.*) The court notes that plaintiff testified that he moved to New York in February, and the hearing was in October. It appears that plaintiff may not have been taking the Flexeril regularly for his pain.

Later during the hearing, the ALJ asked about the effectiveness of the medication that plaintiff was taking. (T. 35). Plaintiff testified that he took the low dose of aspirin every day, again implying that he did not take the Flexeril every day, and that he only needed the stronger medication occasionally.[18] (*Id.*) He stated that the Flexeril made him drowsy. The ALJ noted that he had also been prescribed Gabapentin, and plaintiff stated that although he started taking the medication, it made him so sick that the doctor

---

[18] That testimony would be consistent with his continuing to have sufficient Flexeril to take after more than the number of months for which it was prescribed in North Carolina.

told him to stop taking it. (T. 35-36). However, the doctor did not prescribe any other medication to replace it, nor did he prescribe any other treatment. (T. 36). Plaintiff testified that he tried some experimental treatment with a mirror at the bottom of his leg, "so [his] brain could see that the leg was no longer there, and that did help with the [phantom pain.]" (T. 36).

While it may be true that plaintiff is having trouble obtaining insurance or paying for medical treatment, it is also true that the doctors have not prescribed more potent medication that plaintiff cannot obtain. In fact, plaintiff testified that when he could not take one medication because of its side effects, the doctor did not prescribe a replacement. He did not state that he could not afford a replacement. Thus, the ALJ could consider the low dose of pain medication as inconsistent with a claim of "disabling" pain.[19]

Finally, the ALJ considered the fact that plaintiff was able to drive although he "tries" not to do so. Plaintiff did testify that he drives himself to the store for milk and bread approximately once per week. (T. 14, 39-40). Plaintiff testified that he was "uncomfortable" because he had to use his left leg, and he had never done that before. (T. 39). He did not testify that he could not drive or that it was painful for him. He

---

[19] Plaintiff also argues that the ALJ should have analyzed plaintiff's failure to take pain medication under Social Security Ruling ("SSR") 82-59 which governs the failure to follow prescribed treatment. However, as the defendant argues, the ALJ did not state that plaintiff failed to take prescribed medication. The ALJ was commenting upon the low dose and minor medication that plaintiff was actually taking for pain. In any event, plaintiff testified that the doctor did not prescribe additional medication after plaintiff was unable to take the Gabapentin. Thus, SSR 82-59 is inapplicable to this case, and the ALJ did not err in failing to discuss it.

stated that he was "just uncomfortable using his left leg."[20] (T. 40). The ALJ is entitled to consider plaintiff's daily activities when determining credibility. Thus, when the ALJ states that there are "examples" of things that detract from credibility, the ALJ is referring to credibility regarding claims of "disabling" pain.

Notwithstanding that the ALJ's first basis for rejecting plaintiff's complaints of pain does not seem to relate to credibility, any error is harmless because the ALJ relied upon two other bases that were supported by substantial evidence, and the medical evidence also supports the ALJ's finding. *See Chambers v. Commissioner of Soc. Sec.*, No. 7:14-CV-190, 2015 WL 6157434, at *9 (N.D.N.Y. Oct. 20, 2015) (finding harmless error in credibility analysis when the ALJ conducted an otherwise appropriate analysis that was supported by substantial evidence, notwithstanding error in interpreting a physician's statement); *Buscemi v. Colvin*, No. 13-CV-6088, 2014 WL 4772567, at *17 (W.D.N.Y. Sept. 24, 2014) (ALJ's error in analyzing credibility is harmless when there is substantial evidence supporting the remainder of the credibility analysis); *Barringer v. Commissioner of Soc. Sec.*, 358 F. Supp. 2d 67, 82 n.26 (N.D.N.Y. 2005) (ALJ's misstatement of plaintiff's daily activities was harmless error where the credibility assessment is amply supported by other substantial evidence) (citations omitted)).

## IX.   GRIDS/VOCATIONAL EXPERT

### A.   Legal Standards

Once the plaintiff shows that he cannot return to his previous work, the

---

[20] The amputation was of his right leg.

Commissioner bears the burden of establishing that the plaintiff retains the RFC to perform alternative substantial gainful work in the national economy. *Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004). In the ordinary case, the ALJ carries out this fifth step of the sequential disability analysis by applying the applicable Medical-Vocational Guidelines ("the Grids"). *Id.* The Grids divide work into sedentary, light, medium, heavy, and very heavy categories, based on the extent of a claimant's ability to sit, stand, walk, lift, carry, push, and pull. 20 C.F.R. Pt. 404, Subpt. P, App. 2; *Zorilla v. Chater*, 915 F. Supp. 662, 667 n.2 (S.D.N.Y. 1996). *See also* 20 C.F.R. §§ 404.1567 & 416.967. Each exertional category of work has its own Grid, which then takes into account the plaintiff's age, education, and previous work experience. *Id.* Based on these factors, the Grids help the ALJ determine whether plaintiff can engage in any other substantial work that exists in the national economy. *Id.*

"Although the grids are 'generally dispositive, exclusive reliance on [them] is inappropriate' when they do not fully account for the claimant's limitations." *Martin v. Astrue*, 337 F. App'x 87, 90 (2d Cir. 2009) (citation omitted). When significant nonexertional impairments[21] are present or when exertional impairments do not fit squarely within Grid categories, the testimony of a vocational expert is required to support a finding of residual functional capacity for substantial gainful activity. *McConnell v. Astrue*, 6:03-CV-0521 (TJM), 2008 WL 833968, at *21 (N.D.N.Y. Mar. 27, 2008) (citing, *inter alia*, *Bapp v. Bowen*, 802 F.2d 601, 605 (2d Cir. 1986).

---

[21] A "nonexertional" limitation is a limitation or restriction imposed by impairments and related symptoms, such as pain, that affect only the claimant's ability to meet the demands of jobs other than the strength demands. 20 C.F.R. §§ 404.1569a(c), 416.969a(c).

"If a claimant has nonexertional limitations that 'significantly limit the range of work permitted by his exertional limitations,' the ALJ is required to consult with a vocational expert[,]" rather than relying solely on the Grids. *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (*citing Bapp v. Bowen*, 802 F.2d 601, 605 (2d Cir. 1986)). The mere existence of a nonexertional impairment does not automatically require consultation with a vocational expert, nor does it preclude reliance on the Guidelines. *Bapp v. Bowen*, 802 F.2d at 603. The requirement for a vocational expert is triggered when a nonexertional impairment causes an "additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity." *Id*. at 605-06. The appropriateness of applying the Grids and the necessity for expert testimony must be determined on a case-by-base basis. *Id*. at 605.

### B. Application

The ALJ found that plaintiff could perform a full range of light work and determined that the environmental wetness restriction would have little or no effect on the potential occupational base for unskilled work. (T. 16). Plaintiff argues that the ALJ should not have used the Grids, but should have called a VE to testify because plaintiff has "significant" non-exertional impairments. (Pl.'s Br. at 17). Plaintiff cites "significant pain and difficulties with balance" in addition to the "wetness" limitation cited by the ALJ. However, as discussed above, the ALJ properly discounted plaintiff's claims of "disabling pain," and thus, he justifiably did not consider "pain" as a "significant" non-exertional impairment.

In addition, there are very few indications in the record that plaintiff has "balance" issues that would significantly affect the full range of light work that he can perform.  Mr. Lizotte noted on September 23, 2011 that plaintiff was feeling "off balance" on uneven ground. (T. 365).  However, after Mr. Lizotte adjusted plaintiff's prosthesis, he noted that plaintiff was feeling "more balanced."[22] (*Id.*)  Dr. Ganesh noted that without the prosthesis, plaintiff "was able to hop on the left lower extremity with the aid of the cane," notwithstanding the fact that she checked the box on plaintiff's RFC evaluation, indicating that he could "never" balance. (T. 430, 435).  There is no indication of a serious problem with plaintiff's balance, or that any problem balancing would affect his ability to perform light work.[23]  Finally, as the ALJ correctly stated, the restriction on wetness has little or no effect on the potential occupational base of light work.

Thus, the ALJ correctly found that plaintiff had no non-exertional impairments that would have substantially narrowed the occupational base of light work to the extent that a VE would be necessary to determine whether plaintiff could perform other work in the national economy.  Her use of the Grid was supported by substantial evidence.

**WHEREFORE**, based on the findings above, it is

---

[22] Additionally, to the extent that plaintiff demonstrated some balance difficulties, as Dr. Cortijo stated, "difficulties with balance, gait, etc are the usual trial and error, with modifications and the results of those modifications, which comes with any early prosthesis." (T. 393).

[23] The court notes that even in Mr. Lizotte's restrictive RFC, there is no mention of an inability to balance. (T. 391-92).  The activities listed are twisting, stooping (bending), crounching/squatting, climbing ladders and climbing stairs. (T. 392).

**RECOMMENDED**, that the Commissioner's determination be **AFFIRMED** and the plaintiff's complaint be **DISMISSED**.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have 14 days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN 14 DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: January 8, 2016

Hon. Andrew T. Baxter
U.S. Magistrate Judge